Filed 6/16/25  In re Z.H. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re Z.H., a Person Coming Under the Juvenile Court Law. | C102266 |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>Z.H.,<br><br>       Defendant and Appellant. | (Super. Ct. No. JV141504) |

A juvenile petition alleged that Z.H. committed lewd acts upon or with the body of a 13-year-old girl, robbed and assaulted a 68-year-old man, and committed two rapes when Z.H. was 16 and 17 years old.  The juvenile court granted the People's motion to transfer him to a court of criminal jurisdiction under Welfare and Institutions Code

1

section 707.[1]  In this appeal from the transfer order, Z.H. contends that the juvenile court improperly penalized him for denying responsibility for the charged offenses during an interview with an evaluating mental health expert.  We disagree with this contention and therefore affirm the court's order.

BACKGROUND

I.

In September 2022, the district attorney filed a petition alleging that Z.H. violated Penal Code section 288, subdivisions (a) and (b)(1) in the summer of 2021, when he was 16 years old.  According to the police report, the minor victim, who was 13 years old and a friend of Z.H.'s sister, was spending the night at their house.  The minor victim went into a room with two twin beds and laid down on one of them.  Z.H. came in and sat on the other bed.  He grabbed the minor victim's hand and pulled her toward him.  She tried to pull away but was not strong enough.  Z.H. tried to get the minor victim to kiss him, but she said no.  Z.H. then grabbed her hand, put it down his pants, and moved it up and down his penis until he ejaculated.

Police arrested Z.H. in November 2022, and the juvenile court ordered him detained in juvenile hall.  The court also ordered a report prepared pursuant to Penal Code section 288.1 regarding Z.H.'s mental condition.

Shortly thereafter, the district attorney filed a subsequent petition alleging that Z.H. had committed additional offenses, including robbery (Pen. Code, § 211), assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), and elder abuse (Pen. Code, § 368, subd. (b)(1)).  With respect to each of these counts, the petition alleged that Z.H. personally inflicted great bodily injury on the victim (Pen. Code, § 12022.7, subd. (a)).  As recounted in the police report, in November 2022, 68-

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

year-old C.B. went to the bank and withdrew money from the ATM.  When he left the bank, two people approached him and asked if he wanted to buy some marijuana for $20. When C.B. held out a $20 bill, they grabbed it and left.  C.B. followed them, and they asked if he wanted to go into an alley.  C.B. declined and got on a light rail train.  The two people followed him as he changed trains.  When C.B. got off at his stop, they pushed him to the ground, hit him in the head twice, and kicked him three times, breaking his arm.  The pair took money and an ATM card from C.B.'s wallet.  Police later identified Z.H. and the other assailant from security footage.

In March 2023, the district attorney filed an amended petition, adding allegations that Z.H. raped a woman by force or fear in May 2021 (Pen. Code, § 261, subd. (a)(2)), forced her to commit an act of oral copulation against her will while acting in concert with another person (Pen. Code, § 287, subd. (d)(1)) and raped another woman by force or fear in May 2022.  The police report for the May 2021 rape stated that R. Doe got off a light rail train and asked two juveniles for directions to a restroom.  They pointed toward a dumpster, and R. Doe went behind it and urinated.  One of the juveniles followed her and pushed her to her knees before she could pull up her pants.  He climbed on top of her and put his penis in her vagina until he ejaculated inside her.  He called the second juvenile over, telling him it was his turn.  The second juvenile grabbed R. Doe's head and forced her to orally copulate him for about 10 minutes before he ejaculated on the ground.  The pair walked away with R. Doe's purse, leaving her on the ground.  Z.H.'s DNA matched the DNA found in a vaginal swab taken from R. Doe.

The police report for the May 2022 rape stated that A. Doe was walking to the store one night, when she recognized one of a group of four teenagers and stopped to talk. The group pulled her into a vacant apartment in a nearby apartment complex where three of the teenagers held her down and raped her.  One of the perpetrators grabbed her by the hair and hit her in the face.  The group stole her cell phone, money, and marijuana.  They hit her until she gave them the password for her phone, then used her phone to withdraw

3

money from her bank account.  A. Doe identified Z.H. as one of the attackers with 90 percent confidence.  A detective later found videos Z.H. had recorded of himself on a storage account linked to A. Doe's phone.  Z.H.'s DNA matched the DNA found in a vaginal swab of A. Doe.

## II.

In March 2023, the district attorney filed a motion under section 707 to transfer Z.H. to a court of criminal jurisdiction.  In support of the motion, the district attorney submitted numerous exhibits, including a March 2023 psychological evaluation of Z.H. prepared by a psychology intern under the supervision of psychologist Dr. Blake Carmichael.  That evaluation concluded that Z.H. "likely poses at least a moderate to high risk to other children" and found it "likely that his level of risk would increase further" if it were determined that Z.H. had committed the alleged sexual offenses. (Bolding omitted.)  These conclusions were due in part to Z.H.'s "sexual interests and attitudes appear[ing] to be inconsistent with age expectations (e.g., unable to explain sexual consent), which increases his risk for recidivism."  The report also listed other factors that increased Z.H.'s risk of reoffending:  "[E]vidence of chronic behavioral problems that are targeted to victimize others (e.g., physical aggression, lack of empathy, and poor impulse control)," "prior sexual offenses, multiple victim(s), an unfamiliar victim(s), limited appreciation for risky situations/behavior, poor peer quality, and not accepting responsibility for behavior."

In the interview with the evaluators, Z.H. claimed that the alleged rape victims had reported the encounters as rapes because his friends had stolen their purses and phones. Regarding the May 2021 rape allegations, Z.H. "denied forcing the victim to engage sexually[, saying,] 'she wanted to have sex with us, but she got upset when my friend stole her purse and phone.  She would not have said we raped her if he did not steal her stuff.' "  Regarding the May 2022 rape allegations, Z.H. "described a woman walking up to him and his friends asking to have sex with them. . . .  '[W]e took her to our hangout,

4

and we took turns having sex with her. After we finished, my friend robbed her and stole her phone and weed. She then told the police we raped and robbed her.' When asked by [one of the evaluators] if Z[.H.] had forced the woman to have sex, he replied, 'no, she wanted it.' When further asked about the unlikelihood of being accused of rape twice due to a friend robbing the alleged victims, Z[.H.] stated, 'I have to find new friends, I hang out with the wrong people.' Z[.H.] did not speak to his role in the above incidents, aside from being with people who acted illegally by robbing or taking items from the alleged victims."

When asked about the allegations that he committed lewd acts with his sister's 13-year-old friend in the summer of 2021, Z.H. said, " 'the girl is saying I did something to her because she got caught with some boys, and her dad was upset with her.' " The report noted that Z.H. "had difficulty acknowledging the possible impact such a crime would have on the alleged victim and returned to restate he did not harm her[:] 'I did not force her to do anything with me, I don't do that stuff, and I was not living there.' He continued to deny the characterization of the allegations throughout the interview."

Based on these responses, the report noted that Z.H. would need to learn to stop minimizing his role in the offenses for treatment to be successful: "During the evaluation, Z[.H.] was anxious when discussing sexual behavior and the alleged incident, which led to a minimization of his actions. He recognizes that some actions are inappropriate, but he seems to focus on avoiding consequences rather than better understanding his own behavior. Z[.H.]'s treatment provider should challenge him if he becomes avoidant of or minimizes the role he played in offensive, rule breaking, and criminal behavior. Irrespective of the treatment modality, it will also be important that a provider addresses Z[.H.]'s cognitive distortions about sexual activity, consent, and intimacy."

The juvenile court granted several continuances to allow time for the probation department to prepare a report and for a psychological evaluation of Z.H. to be

performed. In June 2024, the probation department submitted a social study report recommending that the court grant the prosecution's request to transfer Z.H. to a court of criminal jurisdiction. The report detailed facts concerning Z.H.'s history of juvenile delinquency, background, and amenability to rehabilitation.

With respect to his delinquency history, the report explained that Z.H. had been the subject of multiple wardship petitions and had failed to comply with conditions of release. Specifically, in November 2021, the district attorney had filed a petition alleging that Z.H., who was then 16 years old, unlawfully took and drove a car without the owner's consent (Veh. Code, § 10851, subd. (a)) and received the car knowing it had been stolen (Pen. Code, § 496d, subd. (a)). In that case, the juvenile court ordered Z.H. detained on electronic monitoring, and Z.H. admitted violating Vehicle Code section 10851, subdivision (a) pursuant to a negotiated disposition. After reviewing the probation department's report in that case, which recounted a significant history of truancy and defiance at home, the court adjudged Z.H. a ward of the court, committed him to the care and custody of his great-grandmother with whom he lived, and imposed 45 days of electronic monitoring. Less than two weeks later, the probation department filed a petition alleging that Z.H. had violated the terms of his probation by removing his ankle monitor, leaving his home without permission, and remaining away from his home overnight also without permission. Z.H. admitted to remaining away from his home overnight without permission, and the juvenile court dismissed the remaining allegations. The court imposed an agreed-upon disposition, revoking and reinstating probation with the original terms, plus a new requirement that Z.H. serve 15 days in juvenile hall. In February 2022, the probation department filed another petition, this time alleging that, as soon as he was released from juvenile hall, Z.H. refused to attend school, left his home without permission, and stayed away for more than 48 hours.

Four months later, the district attorney filed a petition alleging that Z.H., by then age 17, had been a passenger in a stolen vehicle and had violated Penal Code

section 148.9, subdivision (a) by falsely identifying himself to a police officer when detained. According to the intake report, Z.H. refused to attend school and came and went from his home as he pleased. The juvenile court ordered Z.H. detained in juvenile hall. Z.H. admitted violating Penal Code section 148.9, subdivision (a) in exchange for dismissal of the allegations that he violated the terms of his probation. The negotiated disposition included the time Z.H. had already served in juvenile hall plus 30 days of electronic monitoring. After the probation department informed the juvenile court that Z.H. had tampered with his ankle monitor and left his home, the court issued a warrant for Z.H.'s arrest.

In addition to describing this history of wardship petitions, the probation department's June 2024 social study report noted that, since being detained in juvenile hall in November 2022, Z.H. had more than 100 incident reports "generated for agitation, school suspension and refusal, gang language and gang agitation, trading, sharing and stealing food, near fight, not following instructions, threatening staff and residents, staff disrespect, door kicking, excessive point loss, inappropriate comments towards staff including racist comments, calling staff 'his bitch,' and asking for a staff's phone number, horseplaying, bullying, inappropriate photographs, passing prescription medications to other residents, contraband, refusing to return to his room resulting in non-compliant situations, and not following instructions during an emergency." Z.H. had also been involved in approximately eight fights, the most recent in May 2024, and had assaulted two different residents by spitting on them.

According to unit staff, Z.H.'s behavior while in custody "has been maladaptive and extremely poor. He has difficulty following simple instructions and coexisting with peers and staff respectfully. He regularly incurs point losses for being disrespectful, threatening, and bullying other residents. [Z.H.]'s hostile and insulting behavior towards residents and staff is often unprovoked or in response to being held accountable for negative behaviors. [Z.H.] displays no self-control or accountability for his actions."

7

The probation department assessed that Z.H. was "at a [v]ery [h]igh risk to reoffend," noting that "[h]igh need areas include: . . . Prior and Current Offenses/Dispositions, Family Circumstances/Parenting, Education/Employment, Peer Relations, Leisure/Recreation, Personality/Behavior and Attitudes/Orientations." It stated that "[m]oderate need areas include: Substance Abuse," and "strengths include: Supportive great-grandmother."

Based on all of these facts, the social study report concluded that if the matter remained under the jurisdiction of the juvenile court, Z.H. "would have no probable benefit from a commitment" to Valley Oak Youth Academy (VOYA), a secure youth treatment facility. The report recommended transferring the case to criminal court.

Z.H. opposed the prosecution's transfer motion and submitted an expert report from a psychiatrist, Dr. Anne McBride, which she prepared at the request of Z.H.'s counsel and which drew from numerous records. Her report "assess[ed] the probability that [Z.H.] could be rehabilitated within the California Juvenile Justice System prior to reaching 25 years of age." She concluded, "with reasonable medical certainty," that Z.H. could "be rehabilitated prior to the expiration of juvenile court jurisdiction."

Before she interviewed Z.H., Dr. McBride explained to him that the evaluation was not confidential, that she would discuss her findings with his attorney, and that she may submit her findings to the court in a report and in testimony. Z.H. indicated that he understood the evaluation was to help determine whether he should stay in juvenile court or be transferred to criminal court.

In her interview of Z.H., Dr. McBride asked about the two alleged rapes. Regarding the alleged May 2021 rape, Z.H. stated: " 'It was me and my cousin and he dared me . . . because it was someone right there . . . to ask her to do something and I asked her to do something and she did it and it wasn't forceful. She asked me for money after and I didn't have money so we just left and that was it.' He explained, 'I asked her if she could give me head and she did.' " When Dr. McBride asked why the victim

8

would report she had been raped, Z.H. answered, " 'Because she expected money and we didn't give her money.' " Dr. McBride asked if there had been a miscommunication, and Z.H. responded, " 'Yeah because if she had asked for money before, I would have told her I didn't have money and it wouldn't have happened.' " Z.H. then "indicated that he engaged in both vaginal and oral sex." When Dr. McBride asked if it was possible that the victim felt coerced or forced into sexual activity, Z.H. said, " 'Nothing really forced happened.' "

Regarding the alleged May 2022 rape, Z.H. stated that the victim was drunk, walked up to him and his friends, and wanted to have sex. The victim reported robbery and rape only because one of his friends stole money from her. Z.H. said, " 'I just had sex with her and that was it. She was sitting there and smoking with us [after sex]. And then we all left.' " When Dr. McBride asked about the victim being drunk, Z.H. responded, " 'She knew what was happening.' " Dr. McBride asked Z.H. whether an intoxicated person would be able to consent to sexual activity, and he replied, " 'Not really, but I didn't think about that at the time, I just wasn't thinking.' " When Dr. McBride asked if it was unusual to have multiple people engaged in sexual activity, Z.H. said, " 'It's something that happened before, but I'd be thinking about that it's not right to be doing that.' " Z.H. denied worrying that the victim had been forced into sexual activity, saying, " 'Nothing was forceful. She wanted to do it. Because when I walked in, she was like come on.' "

Based on her interview of Z.H. and a review of records and other risk-assessment information, Dr. McBride diagnosed Z.H. with attention-deficit/hyperactivity disorder (ADHD); posttraumatic stress disorder (PTSD); cannabis use disorder; conduct disorder, childhood-onset type; and specific learning disorder. She determined that "he has multiple needs and risk factors which are highly treatable and for which treatment is available within the juvenile justice system, which supports that [Z.H.] can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." Other factors she

9

saw as supporting Z.H.'s amenability to treatment in the juvenile system included "his motivation to engage in treatment, some awareness of problems, some feelings of guilt/remorse, expects to change, open to change, partial insight into the source of his problems, anxiety over his circumstances, and has protective factors and positive attachments."

In September 2024, the juvenile court held a hearing on the transfer motion. By this time, Z.H. was 19 years old.

At the hearing, Dr. McBride testified that she understood that the VOYA program would treat all of Z.H.'s diagnoses. She estimated that treatment would take a number of years: one to two years for sexual offender treatment, one year to treat PTSD, and one year to treat ADHD.

On cross-examination, Dr. McBride agreed that it was important for a person rehabilitating after committing criminal offenses as a minor to take responsibility for his actions. She also agreed that Z.H. had not taken responsibility for raping two women or committing lewd acts upon a 13-year-old girl, but stated that doing so "would be an important part of the treatment process and program." Dr. McBride characterized Z.H.'s description of the robbery as "greatly minimiz[ing] his actions."

After considering the testimony, exhibits, and written party submissions, the juvenile court found "by clear and convincing evidence that [Z.H.] is not amenable to rehabilitation while under the jurisdiction of the juvenile court." The court reasoned that Z.H. could not be rehabilitated "within any timeframe, let alone the timeframe that encompasses the juvenile court jurisdiction." To the court, Z.H. appeared to be "an individual who cares only about himself and no one else. He will do whatever he wants and he does not care whoever he hurts to satisfy his own desire for sex and money." The court explained that Z.H. had "committed over 100 violations" while in juvenile hall, "including fights, drugs, aggression, [and] disrespect to teachers and probation staff." "In addition, while he was previously on probation when he was offered some treatment, he

10

cut off his electronic monitor and absconded for months." Importantly, the probation officers who interacted with Z.H. on a daily basis asserted that "he is not rehabilitatable within juvenile court jurisdiction."

The juvenile court further stated that, when Z.H. had the opportunity to show remorse for his actions and that he could be rehabilitated, he instead "claimed the sex with the two adult women was consensual, that the child molestation never happened, that he just grabbed money out of the robbery victim's hand, that he had nothing to do with the severity of the injuries suffered by the 68-year-old man." The court found these explanations "[a]ll totally unbelievable."

The juvenile court additionally did not find Dr. McBride's testimony compelling, instead commenting that it had been tailored to advance a particular position. The court was thus unpersuaded by her opinion that Z.H. could be timely rehabilitated.

As to the five criteria under section 707 for determining whether to transfer Z.H.'s case to criminal court, the juvenile court found the evidence weighed heavily against Z.H. remaining in juvenile court. The court first found that "the offenses show[ed] sophistication" because Z.H. actively participated in the rapes in concert with others, in areas where it would be difficult to discover the crimes; he also lured one of the victims through his conversation with her. Z.H. likewise showed great patience and planning during the robbery, waiting until the victim got off his third light rail train before attacking him while the victim attempted to escape. The court also weighed Z.H.'s childhood trauma as a factor in evaluating sophistication, noting that his great-grandmother became his guardian when he was two years old, before he would remember, and he had been shot at when he was 16 years old, when "he was already on his path to anti-social behavior." As to whether Z.H. could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the court cited Z.H.'s behavior in juvenile hall and on electronic monitoring, together with "his unbelievable denials of the charged crimes, as evidence[] why he cannot be rehabilitated before the juvenile court

11

jurisdiction" would end. Regarding Z.H.'s delinquent history, the court found it significant, noting Z.H.'s prior admissions and violations of probation. With respect to the success of previous attempts at rehabilitation, the court found that "[a]ll attempts [had] failed" because Z.H. was unwilling to engage and participate in any of the offered rehabilitative programs. Finally, regarding the circumstances and gravity of the offenses, the court found that the charges in the petition were "all extremely serious."

Based on this analysis, the juvenile court granted the district attorney's motion to transfer Z.H. to a court of criminal jurisdiction. Z.H. filed a timely notice of appeal from the transfer order.

DISCUSSION

To order an alleged juvenile offender transferred to a court of criminal jurisdiction, the juvenile court must "find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) In making that determination, the court must consider five criteria: (1) "The degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).

Section 707 prescribes various factors for juvenile courts to consider when evaluating each of these criteria. For example, when assessing criminal sophistication, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure

12

on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).) When determining "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction," the juvenile court "shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(i) & (ii).) And when considering the minor's previous delinquent history, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(ii); see also § 707, subd. (a)(3)(D)(ii) & (E)(ii).)

"We review the juvenile court's determination to transfer a minor to criminal court for abuse of discretion." (*In re J.S.* (2024) 105 Cal.App.5th 205, 211.) "[W]e do not reweigh the evidence and we do not substitute our discretion for the discretion exercised by the trial court." (*Ibid.*)

Z.H. asserts that the juvenile court erred in considering his denials of the alleged offenses because, he maintains, his denials were not relevant to the juvenile court's transfer decision. We disagree because a minor's willingness to take responsibility for his or her actions is a "relevant factor" in evaluating his or her amenability to rehabilitation under section 707. The expert evaluators in this case agreed that taking responsibility was an important consideration in understanding Z.H.'s risk for reoffending. For example, Dr. Carmichael's report described "not accepting responsibility for behavior" as one of the "qualities of Z[.H.]'s alleged offense behaviors [that is] associated with a higher risk for sexual recidivism." When Dr. McBride was asked at the transfer hearing whether it is "important for a minor that is going to

13

rehabilitate to take responsibility . . . for their actions," she responded, "Yes." She agreed that Z.H. "did not take responsibility for [his] behaviors, and that would be an important part of the treatment process and program." It was not an abuse of discretion for the juvenile court to consider evidence of Z.H.'s unwillingness to take responsibility for his actions and his minimization of his behavior in deciding whether he satisfied the criteria set forth in section 707.

Citing *In re David K.* (1978) 79 Cal.App.3d 992, *Kody P. v. Superior Court* (2006) 137 Cal.App.4th 1030, and *In re Lawanda L.* (1986) 178 Cal.App.3d 423, Z.H. additionally contends that the juvenile court punished him for denying the charges against him. We do not agree with this characterization of the court's ruling. As noted above, while the court cited Z.H.'s denials of the alleged conduct and his minimization of his behavior, those statements by Z.H. were among many factors the court considered when evaluating whether he was amenable to rehabilitation while under the juvenile court's jurisdiction. We do not read the juvenile court's reliance on those statements as suggesting that the court granted the motion to transfer as a means of punishing Z.H. for refusing to admit the truth of the prosecution's allegations.

Moreover, Z.H. did not simply deny or refuse to admit the allegations against him. Rather, Z.H. admitted his participation in the alleged incidents but gave "unbelievable" accounts that minimized or eliminated his personal responsibility. For example, Z.H. told the experts that A. Doe was so drunk that he and his friends "thought there was something wrong," but she said she wanted to have sex with them so they "took her to [their] hangout" and " 'ended up having sex with her.' " Z.H. stated that this was acceptable because, despite being drunk, A. Doe " 'knew what was happening' " and " '[n]othing was forceful,' " " '[b]ecause when I walked in, she was like come on.' " Z.H. also claimed both alleged rape victims only reported the rapes because his friends robbed them. Dr. McBride likewise described Z.H.'s description of the robbery as "greatly minimiz[ing] his actions." In this context, the juvenile court fairly characterized

14

Z.H.'s statements and, like the experts, appropriately considered Z.H.'s minimization of his behavior as an impediment to rehabilitation.

The cases cited by Z.H. are also inapposite. In *In re David K.*, *supra*, 79 Cal.App.3d at page 1002, the record supported "the view that the [minor's Youth Authority] commitment was made to *punish* [the minor] for his failure to talk about [his involvement in a separate] offense." The appellate court stated that a Youth Authority commitment "cannot legally be made by the juvenile court as a means of *punishment* rather than a final resort for rehabilitation." (*Ibid.*) Here, in contrast, the record does not support the conclusion that the juvenile court transferred Z.H. as a means to punish him for not admitting the allegations. Further, *David K.* does not discuss the considerations relevant for determining whether a juvenile offender is amenable to rehabilitation under section 707, nor did it address a situation where an alleged juvenile offender, as here, chose to talk about his conduct and the juvenile court considered his statements in making the amenability determination.

In *Kody P. v. Superior Court*, *supra*, 137 Cal.App.4th at page 1037, the appellate court held that, while a minor's admission of an offense might be a relevant factor in determining whether he was suitable for informal supervision, the juvenile court erred in denying informal supervision based solely on the otherwise-eligible minor's refusal to admit the charges. The court explained that the applicable rule of court requires consideration of a range of factors, none of which required an admission of the offense. (*Ibid.*) The present case does not involve informal supervision; and the juvenile court here did consider a range of factors, without conditioning continued jurisdiction in juvenile court on Z.H. admitting the charges alleged.

In *In re Lawanda L.*, *supra*, 178 Cal.App.3d at page 431, the appellate court recognized that a juvenile court may not "punish [a] minor for exercising her due process right" to contest the charges against her. For the reasons we have explained, the juvenile court did not impose any such sanction here.

15

DISPOSITION

The order granting the motion to transfer Z.H. to a court of criminal jurisdiction is affirmed.


/s/
FEINBERG, J.



We concur:



/s/
ROBIE, Acting P. J.



/s/
MESIWALA, J.